Filed 5/7/21  In re M.C. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | H048184 (Monterey County Super. Ct. Nos. 20JV000090, 19JV001114) |
| THE PEOPLE, Plaintiff and Respondent, v. M.C., Defendant and Appellant. | |

Minor M.C. appeals from a juvenile court dispositional order committing him to the California Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF).[1]  M.C. raises two claims of error.  He contends that his DJF commitment is unauthorized because, even though he admitted a violation of Penal Code section 246,

---

[1] DJF is also known as the Division of Juvenile Justice (DJJ).  "DJJ/DJF is the current name of the former California Youth Authority [CYA].  [Citation.]  The terms DJJ and DJF are used interchangeably in the case law."  (*In re N.C.* (2019) 39 Cal.App.5th 81, 85, fn. 3.)  In accord with the usage of the parties in this appeal, we use DJF.

the crime he admitted is not one of the commitment-eligible offenses specified in Welfare and Institutions Code section 707, subdivision (b) (hereafter section 707(b)).[2] In addition, M.C. argues the juvenile court abused its discretion when it committed him to DJF because there was not substantial evidence either that he would benefit from placement there or that a less restrictive alternative would be ineffective or inappropriate.

For reasons that we will explain, we affirm the juvenile court's dispositional order.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

On December 19, 2019, the Monterey County District Attorney filed a juvenile wardship petition under section 602, subdivision (a) ("December 2019 petition"), alleging that, on or about December 17, 2019, then 15-year-old M.C. committed the crimes of receiving stolen property (a motor vehicle) (Pen. Code, § 496D, subd. (a); count 1) and unlawful driving or taking a vehicle without consent of the owner (Veh. Code, § 10851, subd. (a); count 2). (Case No. 19JV001114.)

The next day, December 20, 2019, M.C. admitted both counts of the December 2019 petition. On January 14, 2020, the juvenile court granted M.C. a deferred entry of judgment (§ 790) for 24 months with probation supervision and various terms and conditions.

On January 28, 2020, the district attorney filed another wardship petition under section 602, subdivision (a) ("January 2020 petition"), against then 16-year-old M.C.[3] The petition alleged that, on or about January 26, M.C. committed the crimes of carrying a loaded firearm (Pen. Code, § 25850, subd. (a); count 1) and shooting at an inhabited dwelling (Pen. Code, § 246; count 2). (Case No. 20JV000090.) As to count 1, the petition further alleged alternate penalty enhancements for active participation in a criminal street gang (Pen. Code, § 25850, subd. (c)(3)) and membership in a class of

---

[2] Unspecified statutory references are to the Welfare and Institutions Code.
[3] Unless otherwise indicated, all dates occurred in 2020.

2

persons prohibited from possessing a firearm (Pen. Code, § 25850, subd. (c)(4)). The petition also alleged a criminal-street-gang sentencing enhancement. (Pen. Code, § 186.22, subd. (b)(1)(B).)

On the same day (January 28), a probation officer with the Monterey County Probation Department (probation department) filed a notice of probation violation related to the deferred entry of judgment. The notice alleged that M.C. had violated his probation conditions by failing to obey all laws (based on his January 26 arrest), possessing and/or wearing gang-related clothing (a gray hat with a red letter "C"), and possessing and/or consuming illegal drugs (based on a presumptively positive drug test that indicated marijuana use). On January 29, the juvenile court revoked the deferred entry of judgment on the December 2019 petition.

On March 11, pursuant to an agreement between the parties, M.C. admitted counts 1 and 2 of the January 2020 petition, as well as the alternative penalty enhancement allegations for count 1. Based on the agreement, the juvenile court dismissed the gang sentencing enhancement alleged in the January 2020 petition. In addition, regarding the December 2019 petition, M.C. admitted that he had violated the conditions of the deferred entry of judgment.

On April 16, after a contested dispositional hearing regarding the December 2019 and January 2020 petitions, the juvenile court revoked and terminated deferred entry of judgment, declared M.C. a ward of the court, declared the "matter is a felony and a [section] 707(b) offense," and committed M.C. to DJF. The juvenile court set M.C.'s maximum term of confinement for all admitted counts and allegations at six years and four months, with 86 days of credit for time served. M.C. filed a timely notice of appeal from the dispositional hearing order committing him to DJF.

3

B. *Factual Background*[4]

On the evening of December 17, 2019, Monterey police officers saw M.C.—who was then 15 years old—driving a stolen car. The officers stopped M.C. and took him into custody.

On the afternoon of January 26, City of Seaside police officers were dispatched based on reports of "shots fired into a residence" on Trinity Avenue and shots fired near the intersection of Trinity Avenue and Prospect Street. The police saw four people running away from the area, and witnesses reported four to seven people fleeing the scene, some of them wearing red and white hoodies. "The victim and the reporting party were sitting in the living room [of their residence] watching television with their small children when they heard yelling and then a loud 'pop' as the window near the front door shattered." The bullet struck a bookcase inside the house and "was then located in an exterior wall of the residence." Additionally, on January 28, "Victim #2 found a spent bullet at the residence in relation to the shooting that occurred on January 26, 2020." "Victim #2 advised that she found the spent jacket mixed in with the stack of papers that were located on the shoe rack inside the front door on the right side." A police officer took the item and booked it into evidence.

A witness to the incident saw a group of males prior to the shooting. They were wearing red clothing and walking in one direction; and then a male walked toward them from the opposite direction. According to the probation department's detention report, "One subject yelled 'What's up Nigga?' While one subject yelled back, 'I'm Norteño Nigga.' Witnesses heard arguing and what appeared to be a conversation about a previous shooting into a residence." In addition, "[a] witness said two males had

---

[4] We take these facts from probation department reports filed in the juvenile court, including a probation officer's report filed on January 14, a detention report filed on January 28, and a probation officer's supplemental report filed on April 16.

4

handguns and approximately four shots were fired. . . . The witness further stated that shots were fired diagonally toward the direction of [the residence]."

About four hours later, police detained M.C. on a street near his friend's house. The police found a firearm loaded with live and expended rounds in the front pocket of M.C.'s sweatshirt. M.C. was wearing clothing that identified him as a Norteño gang member (specifically, a gray hat with a red letter "C").

M.C. admitted that he was present during the shooting, but he denied that he had fired any shots. M.C. acknowledged being a Norteño gang member associated with the North Side Seaside subset. He said the shooting happened because of a previous argument with the victim. M.C. stated that he had gone with his accomplices to the victim's residence after "getting clearance from older Norteño gang members." M.C. said that one victim (who was a rival gang member and identified in the report as "victim #1") "came out at [*sic*] took the first shot." Two of M.C.'s accomplices returned fire; they "shot several rounds together."

## II.  DISCUSSION

### A.  *Eligibility for DJF Commitment*

M.C. contends his DJF commitment is unauthorized under section 731, subdivision (a)(4), because his violation of Penal Code section 246 is not equivalent to the predicate firearm-discharge offense specified in section 707, subdivision (b)(15) (hereafter section 707(b)(15)). More specifically, M.C. maintains that section 707(b)(15), which states an offense of " '[d]ischarge of a firearm *into* an inhabited or occupied building' " (italics added), is narrower and more aggravated than Penal Code section 246, which prohibits shooting *at* an inhabited dwelling. M.C. further claims that the "aggravating factor" in section 707(b)(15) "was not charged, admitted, nor found to be true" and thus his commitment is unauthorized. He maintains that the error here is "per se reversable" or otherwise prejudicial under *Chapman v. California* (1967) 386 U.S. 18 and *People v. Watson* (1956) 46 Cal.2d 818.

5

The Attorney General responds that M.C.'s DJF commitment is authorized because he admitted a violation of Penal Code section 246 grounded on a shooting into an occupied dwelling and M.C.'s crime is an offense specified in section 707(b).

1. Additional Background

Before M.C. admitted the charges alleged in counts 1 and 2 of the January 2020 petition, the parties and juvenile court discussed the maximum term M.C. faced (i.e., nine years) based on the charges in the two pending petitions. In addition, while admonishing M.C. regarding the consequences of his impending admissions, the court said "I believe that this also would be a [section] 707[(b)] offense." In response to the court's statement, M.C.'s defense counsel and the prosecutor confirmed the court's understanding as to count 2 of the January 2020 petition. The court then advised M.C., "Count 2, shooting *into* an occupied dwelling is a Welfare and Institutions Code [section] 707(b) offense. And what that means is that you could -- you are eligible for a commitment to the Division of Juvenile Justice if that would provide the programs that would be most helpful to you. [¶] Do you understand?" (Italics added.) M.C. responded, "Yes, your Honor." M.C. thereafter confirmed that he was "freely and voluntarily waiving [his] rights," and M.C.'s counsel joined in the waiver and concurred in M.C.'s plea.

The juvenile court then questioned M.C. about the truth of the counts in the January 2020 petition. The court said, "Count 2 states on or about January 26th of that same date, here in Monterey County in Seaside, you did commit the crime of shooting at an inhabited dwelling in violation of Penal Code Section 2446 [*sic*], which is a felony, in that you willfully, unlawfully and maliciously discharged a firearm at an inhabited dwelling house, occupied dwelling; I believe in this case it was actually a house located at [] Trinity Street in Seaside. [¶] Is that true?" M.C. responded, "Yes, ma'am."

Next, the juvenile court asked M.C.'s defense counsel, "And given the information in the detention report, do you stipulate to a factual basis? And I think you have additional discovery, as well." M.C.'s counsel responded, "I have, your Honor. And

6

[M.C.] has been advised that the theory of prosecution would be as accomplice liability. That would be the basis for Count 2. And I would stipulate there was a factual basis based on that theory." The court explained aiding-and-abetting liability to M.C. and said, "[G]iven the information in the detention report, the Court does find that there is a factual basis. I also find that you understand the potential penalties and consequences and that you knowingly, voluntarily and intelligently waived your rights."

The referenced detention report stated that police officers were dispatched to a home on Trinity Avenue upon "a report of shots fired into a residence." The occupants of the home "pointed out a front window of the residence which had been shattered by a bullet. The bullet struck a bookcase inside of the residence. The bullet was then located in an exterior wall of the residence." The detention report also noted that a witness "stated that shots were fired diagonally toward the direction of [the residence]."

### 2. Legal Principles

Section 731, subdivision (a)(4), "authorizes a juvenile court to commit a juvenile who has been adjudged a ward of the court to the DJF if the ward has committed an offense described in subdivision (b) of [section] 707 'and' the ward 'is not otherwise ineligible for commitment to the division under [section] 733.' " (*In re C.H.* (2011) 53 Cal.4th 94, 97; § 731, subd. (a)(4).)

"When a juvenile court commits a minor to the [DJF], the court must specify whether the minor's offense is one covered by . . . section 707, subdivision (b)." (*In re Emilio C.* (2004) 116 Cal.App.4th 1058, 1064 (*Emilio C.*); see also Cal. Rules of Court, rule 5.805(2).) Section 707(b) sets forth an extensive list of offenses, including "[d]ischarge of a firearm into an inhabited or occupied building." (§ 707, subd. (b)(15).)

The language in section 707(b)(15) is different than that set forth in a related Penal Code provision. Penal Code section 246 provides, in pertinent part: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle, occupied aircraft, inhabited housecar, . . . or

7

inhabited camper . . . is guilty of a felony. . . . [¶] As used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."

Regarding the standard of review for M.C.'s claim of error, neither M.C. nor the Attorney General has made any assertion concerning the appropriate standard for our review. One Court of Appeal has observed that "the ultimate determination of whether the offense falls under section 707, subdivision (b) is a question of law. But first, . . . the trial court must consider the evidence before it to determine, as a matter of fact, what the circumstances of the offense were." (*In re Gary B.* (1998) 61 Cal.App.4th 844, 851 (*Gary B.*).) (Italics omitted.) Another Court of Appeal, relying on *Gary B.*, has said: "The juvenile court was entitled to base its Welfare and Institutions Code section 707 determination on facts presented at the disposition hearing that the court found to be true by a preponderance of the evidence. [Citation.] In doing so, the juvenile court was also entitled to look beyond the pleadings and consider the circumstances of appellant's offense. [Citation.] We review the juvenile court's findings under the substantial evidence standard." (*Emilio C.*, *supra*, 116 Cal.App.4th at p. 1065.)

These pronouncements accord with the general proposition that "an appellate court reviews findings of fact under a deferential standard (substantial evidence under California law, clearly erroneous under federal law), but it reviews determinations of law under a nondeferential standard, which is independent or de novo review." (*People v. Cromer* (2001) 24 Cal.4th 889, 894; see *In re R.C.* (2011) 196 Cal.App.4th 741, 748.) Accordingly, we will defer to the juvenile court when considering any factual findings and review de novo questions of statutory interpretation and application of the statute to undisputed facts.

### 3. Analysis

M.C. argues that the necessary "aggravating factor" for DJF commitment eligibility under section 707(b)(15)—i.e., discharge of a firearm *into* an inhabited or occupied building—"was not charged, admitted, nor found to be true."

8

Although we agree with M.C. that the elements of Penal Code section 246 are not, themselves, the same as the offense described in section 707(b)(15),[5] we are not persuaded that the juvenile court improperly committed M.C. to DJF upon his admission to count 2 of the January 2020 petition. In accord with the elements of Penal Code section 246, count 2 only alleged discharge of "a firearm at an inhabited dwelling." However, the record of M.C.'s admission to count 2 supports that M.C. admitted to more than simply aiding and abetting a crime that involved discharging a firearm at a house. His admission here included the distinct factual circumstance of shooting *into* a house.

M.C. admitted a violation of Penal Code section 246 in count 2 based on an agreement between himself and the prosecutor. There is no indication that either party or the juvenile court had any question about whether M.C.'s admission under the agreement satisfied section 707(b)(15). In fact, about one month after M.C. entered his admission, his defense counsel wrote in a motion regarding the potential disposition: "On March 11, 2020, [M.C.] admitted a [section] 707(b) offense."

Further, at the time of M.C.'s admission, the juvenile court found that M.C. "underst[ood] the potential penalties and consequences," which had been explained to him before he admitted count 2. Importantly, when the court admonished M.C. about the consequences of his impending admission, it told M.C. that count 2 involved "shooting into an occupied dwelling." The court also told M.C. that the crime he was about to admit is an offense in section 707(b) that would make him eligible for commitment to DJF. M.C. said he understood this.

In addition, M.C. admitted count 2 upon a stipulated factual basis that established a "[d]ischarge of a firearm into an inhabited or occupied building." (§ 707, subd.

---

[5] "The elements of a violation of [Penal Code] section 246 are '(1) acting willfully and maliciously, and (2) shooting at an inhabited house.' " (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1501; see also *People v. Manzo* (2012) 53 Cal.4th 880, 885 [" 'at' " means "in the direction of or towards"].)

(b)(15).)  The record makes clear that M.C.'s defense counsel stipulated to a factual basis for M.C.'s admission to count 2; counsel advised M.C. about "accomplice liability;" the juvenile court confirmed that M.C. understood his liability for an accomplice's act of "fir[ing] at that home with small children in it;" and the court found a factual basis for M.C.'s admission "given the information in the detention report."  That report described a bullet-shattered front window, a bullet strike to a bookcase inside the house, a bullet located in an exterior wall, and a witness report of shots having been fired toward the residence.

Based on the totality of the circumstances surrounding M.C.'s admission to count 2, we are not convinced by M.C.'s contention that he never made "an admission, adopted or otherwise, to shooting *into* an occupied dwelling, as required for the offense to qualify as a [section] 707(b) offense."  For the reasons discussed, we conclude that M.C.'s admission to count 2 encompassed a knowing and voluntary admission of an underlying factual basis that involved at least one of his accomplices shooting into the inhabited house, not just at it.  Given this conclusion, we further decide that M.C.'s admission to count 2 satisfied the requirement of section 707(b)(15).  Accordingly, the trial court did not err when it determined that M.C. was eligible for commitment to DJF under section 731, subdivision (a)(4), and M.C.'s commitment to DJF is legally authorized.[6]

---

[6] Because we reject M.C.'s argument that he did not admit in the juvenile court to shooting into an inhabited or occupied building, we do not address M.C.'s additional contention that, because "the court is bound by what is admitted or found to be true, it cannot look beyond the charging document when determining a proper and lawful dispositional order."  Nonetheless, we note that M.C.'s argument is contrary to existing precedent.  (See *Gary B.*, *supra*, 61 Cal.App.4th at pp. 851, 853; *Emilio C.*, *supra*, 116 Cal.App.4th at p. 1065.)  Furthermore, M.C.'s reliance on *Apprendi v. New Jersey* (2000) 530 U.S. 466 and related cases in this juvenile proceeding is misplaced, as these cases rely on the Sixth Amendment right to a jury trial, which does not attach to a juvenile proceeding.  (See *In re Travis W.* (2003) 107 Cal.App.4th 368, 378.)

B. *Exercise of Discretion for DJF Commitment*

M.C. claims the juvenile court abused its discretion by committing him to DJF. He argues there was not substantial evidence to support the court's determinations that he would benefit from a DJF commitment and that a less restrictive alternative placement would be ineffective or inappropriate for him.

### 1. Additional Background

Before the dispositional hearing, the probation department submitted a juvenile hall behavior report that described M.C.'s positive conduct in juvenile hall, his participation in multiple programs, and that M.C.'s mother had visited him seven times during his 48 days in custody. The probation department also submitted a supplemental probation officer's report (probation report) that recommended a DJF placement.

The probation report explained that a team of staff members at the Monterey County Youth Center had reviewed M.C.'s case and believed M.C. "was not a suitable candidate for the Youth Center." The team reached this conclusion based on the seriousness of M.C.'s offenses, "his commitment to his gang involvement," community safety, and "the level of sophistication" of M.C.'s crime. The report also noted that the brief period of probation supervision that M.C. had served before his most recent offense "was not a deterrent." The team considered "[a]ll less restrictive measures" but concluded that "given the seriousness of the crime, [M.C.'s] release places the community at risk."

The probation officer who authored the probation report also "staffed" M.C.'s case with an official from DJF. The report explained that if M.C. were committed to DJF, the staff at DJF would assess him for 45 days and then assign him to a facility based on that assessment. The report listed several available programs and services provided at DJF and described, in more detail, five programs geared toward improving social skills and pro-social attitudes, fostering positive decision making, reducing recidivism, avoiding substance abuse, and maximizing re-entry opportunities. The report specifically noted

11

that M.C. "could also benefit from the Substance Abuse Treatment Programs" because of his "history of heavy marijuana" use, and that M.C. "can benefit from the Re-Entry Program." In addition, the report explained that DJF would offer M.C. appropriate educational services and develop a high school graduation plan for him and noted that M.C. "is a student with special educational needs."

Further, the probation report stated that M.C. began associating with gangs when he was 15 years old and had admitted being a Norteño gang member. The report noted that a search of M.C.'s phone revealed he "is heavily entrenched in the Norteño gang lifestyle" and stated that M.C. "will not easily [be] dissuade[d] from a gang lifestyle" given his prior behavior. On the other hand, the report indicated that M.C. had told the probation officer that he "now understands the seriousness of being involved in gangs and he plans to distance himself from his gang associates."

The probation department ultimately recommended that M.C. be committed to DJF "[g]iven community safety, the seriousness of [M.C.'s] offense, his gang involvement, and the level of sophistication [with] which the crime was committed."

In response, M.C. filed a motion for least restrictive placement. M.C. requested a commitment to the Monterey County Youth Center. M.C. argued that there was inadequate evidence to support placement in DJF under section 734 and urged the juvenile court to consider a Youth Center placement as the least restrictive alternative under sections 202, 727.1, and 734.

In his motion, M.C. conceded that an out-of-home placement was appropriate given the serious nature of his current offense. Nevertheless, M.C. contended that he had substantial local family and community support and that a Youth Center placement—by contrast to a distant DJF placement—would allow his family to participate in his rehabilitation. M.C. stated that he had no disciplinary issues during his detention. He maintained that, because he had only been on probation for about two weeks after the deferred entry of judgment for the December 2019 petition, he had not yet received any

12

substantial probation services. M.C. urged that placement in the Youth Center was the next progressively restrictive level of supervision and such a placement would give him an opportunity to demonstrate that he could be rehabilitated without resorting to a harsher DJF commitment. M.C. further maintained that the services available at the Youth Center were comparable to those at DJF and that his gang involvement could be addressed at the Youth Center. M.C. noted his desire to have two small gang-related tattoos removed from his hands and "to cut ties from people he knows are associated in [the gang] lifestyle when it is safe for him to do so."

In addition, M.C. wrote a letter to the juvenile court admitting his mistakes and expressing an understanding of them, stating his belief that the Youth Center would help him make changes in his life, and describing a plan for his future that included getting a high school diploma and going to college to study technology. M.C. also submitted letters from three teachers describing his good behavior, active involvement, and "A" grades.

The prosecutor filed a brief in support of the probation department's DJF recommendation. The prosecutor contended that M.C.'s "strong gang affiliations on the streets and the surroundings at home would render a local commitment inadequate and ineffective." In addition, the prosecutor maintained that a commitment to DJF was appropriate given M.C.'s "criminogenic factors," including his "local [gang] ties, the lackluster support at home, the need for drastic measures, and the wealth of services at [DJF]." The prosecutor also attached an exhibit comprised of "program information" (capitalization omitted) concerning various DJF programs, some of which were mentioned in the probation report, although the program information indicated that they had "expired" in January 2017—that is, three years earlier.

At the contested dispositional hearing, defense counsel argued that several mitigating factors warranted placing M.C. in the less restrictive Youth Center. Counsel noted that M.C. did not shoot a gun on January 26. Counsel maintained that M.C. had

13

cooperated with the police after the shooting, expressed remorse for his actions, and was willing to be held accountable for his conduct. Counsel also explained that M.C.'s mother had "very limited means and resources" "for transportation, [] language, and finances," which would hinder her ability to participate in DJF programs aimed at family reunification, therapy, and educational services.

The juvenile court began its consideration of the disposition by noting that it had reviewed the briefs of the parties, as well as the juvenile hall behavior report, the prior probation officer's reports regarding the December 2019 petition, and the current probation report. The court acknowledged that DJF is "the most restrictive rehabilitative opportunity," but also "has the most comprehensive services" available to juvenile offenders, which the court "believe[d] both attorneys have pointed out." In addition, the court acknowledged that the DJF facilities are further away from M.C.'s "supportive family." The court, however, expressed concern that M.C. had committed his most recent crime shortly after the deferred entry of judgment and after M.C. had said he cared about his family. The court observed that "despite [M.C.] stating that he cared for his family, clearly his other family, the gang family, had a very, very strong pull unfortunately."

The juvenile court noted that M.C.'s behavior in juvenile hall had been good and he had responded to counseling. The court took these facts as indications that M.C. was amenable to change, did well in a structured environment, and would continue doing well at either DJF or the Youth Center. In addition, the court said the fact M.C. was not one of the shooters, was cooperative with the police, and made seemingly truthful, self-incriminating statements "perhaps would weigh in favor of a Youth Center commitment."

On the other hand, the juvenile court viewed the crime as "horrendous." The court observed that M.C. had "aided and abetted the shooting into the home in broad daylight causing two young children, ages four and five, no doubt to be traumatized as a result of having had their home fired into. And all this apparently because an alleged rival gang

14

member lived in that home." Elaborating on the circumstances of the shooting, the court explained that the crime was "one of the most sophisticated attacks" it had seen in a juvenile court case; the crime was planned, premeditated, and done with the permission of older Norteños; the attackers wore gang-related clothing and then changed their clothing afterward to avoid detection; and M.C. apparently reported back to " 'Big Daddy' " after the crime. In addition, M.C. had "completely disregarded" the probation conditions prohibiting his association with gang members, possession of gang indicia, and participation in gang activity.

The juvenile court considered M.C. to be "very deeply entrenched in the gang culture." Furthermore, in addition to having a gun at the time of his arrest, photographs established that M.C. had access to other firearms, including an AR-15 type rifle and a Glock pistol. He also violated a probation condition that prohibited marijuana use. The court said M.C.'s marijuana use was "not a significant factor" in its analysis but noted that M.C.'s use was an indicator of his willingness or ability to abide by the terms and conditions of probation.

The juvenile court mentioned its familiarity with the programs available at the Youth Center and the DJF. The court said it was "very impressed" when it had visited one DJF facility and noted the expertise and compassion shown by DJF staff.

The juvenile court concluded: "The Court does find a probable benefit to [M.C.] from a commitment to [DJF]. I do find less restrictive alternatives would be ineffective and inappropriate at this time. And that is not only due to the facts of this particular case, but also due to his level of involvement in a significant way with the local gang. [¶] Again, the Court recalls seeing an indication that he had been conveying information about some folks that were in county jail that were also involved in the gang. So he is very well entrenched. [¶] I do think it's in his best interest as well to have the best programs available to him. I think it is in his best interest not to be in Monterey County at this time." After briefly noting M.C.'s stated interest in technology and mentioning

15

some of the computer programming and repair courses offered by DJF, the court committed M.C. to DJF.

### 2. Legal Principles

"The statutory scheme governing juvenile delinquency is designed to give the court 'maximum flexibility to craft suitable orders aimed at rehabilitating the particular ward before it.' " (*In re Greg F.* (2012) 55 Cal.4th 393, 411.) When a minor is adjudged a ward of the juvenile court, "the court may make any reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the minor." (§ 727, subd. (a)(1).) In determining a disposition, "the court shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.) The court may also consider public safety and protection. (§ 202, subds. (b), (d).) Further, "[i]f a minor has been removed from the custody of his or her parents, family preservation and family reunification are appropriate goals for the juvenile court to consider when determining the disposition of a minor . . . when those goals are consistent with his or her best interests and the best interests of the public." (§ 202, subd. (b).) The court has a wide range of options available for placement of its wards, including placement through the probation department (§ 727, subd. (a)(4)), commitment to "a juvenile home, ranch, camp, or forestry camp" or "the county juvenile hall" (§ 730, subd. (a)), or commitment to DJF. (§ 731, subd. (a)(4), (c); see *In re Eddie M.* (2003) 31 Cal.4th 480, 488 (*Eddie M.*).)

"Under section 202, juvenile proceedings are primarily 'rehabilitative' [citation], and punishment in the form of 'retribution' is disallowed [citation]. Within these bounds, the court has broad discretion to choose probation and/or various forms of custodial confinement in order to hold juveniles accountable for their behavior, and to protect the public." (*Eddie M.*, *supra*, 31 Cal.4th at p. 507.) However, "[n]o ward of the juvenile court shall be committed to the [DJF] unless the judge of the court is fully satisfied that

16

the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by the [DJF]." (§ 734.) Further, "[i]n order to commit a minor to the [DJF], the record must show that less restrictive alternatives would be ineffective or inappropriate." (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306.)

"The juvenile court's decision to commit a minor to the [DJF] will be reversed only when an abuse of discretion has been shown." (*In re George M.* (1993) 14 Cal.App.4th 376, 379.) A juvenile court does not "necessarily abuse its discretion by ordering the most restrictive placement before other options have been tried." (*Eddie M.*, *supra*, 31 Cal.4th at p. 507.)

### 3. Analysis

Relying primarily on *In re Carlos J.* (2018) 22 Cal.App.5th 1 (*Carlos J.*) and *In re Nicole H.* (2016) 244 Cal.App.4th 1150 (*Nicole H.*), M.C. contends the record lacks substantial evidence supporting that DJF's programs would benefit him or that placing him "in a DJF facility further from his family would somehow meaningfully distance him from the Norteños, or that a commitment to the Youth Center would not have the same effect." In addition, relying primarily on *In re Calvin S.* (2016) 5 Cal.App.5th 522 (*Calvin S.*) and *Carlos J.*, M.C. contends that the juvenile court's finding that less restrictive alternatives would be ineffective and inappropriate is not sufficiently supported and cannot be based "simply on the juvenile court's personal belief" tied to its personal familiarity with DJF or the "nature of the crime alone."

We begin our analysis of M.C.'s first contention by discussing the case law. In *Carlos J.*, the 15-year-old minor "did not have a substantial record of involvement with the juvenile court system." (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 7.) The probation department recommended that the minor be committed to DJF after concluding that he was a public safety risk who needed to be placed in a secure state facility where his educational, therapeutic, and emotional issues could be addressed and where he could

17

receive gang intervention services. (*Id*. at pp. 8–9.) No witnesses testified at the dispositional hearing, and no information was provided about specific services provided by DJF. (*Id*. at pp. 9, 14.)

The juvenile court in *Carlos J.* followed the probation department's recommendation and committed the minor to DJF, noting the minor's long-term gang associations, the seriousness of his offense, and nonspecific " 'recent changes' " at DJF that allowed it to " 'provide additional services.' " (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 9.) The Court of Appeal reversed, concluding that the juvenile court's decision was not supported by substantial evidence. (*Id*. at pp. 10–15.) The appellate court held that "[i]n order for a juvenile court to make the determination of probable benefit . . . there must be *some* specific evidence in the record of the programs at the DJF expected to benefit a minor." (*Id*. at p. 10.) The court also concluded that "[w]here a minor has particular needs, the probation department should also include *brief* descriptions of the relevant programs to address those needs." (*Id*. at p. 12.)

In *Nicole H.*, the minor was before the juvenile court on her first arrest and the probation department determined that the minor "was at low risk for re-offense." (*Nicole H.*, *supra*, 244 Cal.App.4th at p. 1155.) The Court of Appeal found the record was "devoid of any evidence or reasoning supporting a group home placement far from [minor']s father's home." (*Id*. at p. 1157.) In reaching this conclusion, the appellate court noted that the juvenile court "made no express finding that a remote placement . . . met 'the minor's special needs and best interests,' " (*ibid*.) and the probation officer's report "did not provide any reasons why a placement at [the remote group home] would be in [minor]'s best interests." (*Id*. at p. 1158.) In addition, the appellate court observed that "[t]here is no evidence that [minor] was being subjected to ongoing negative influences at home, and, even if there were such evidence, there is no indication the probation department or the juvenile court believed a placement further away than

[alternative placements] was necessary to remove [minor] from whatever negative influences existed" near her father's home.  (*Id*. at p. 1158.)

*Carlos J.* and *Nicole H.* are distinguishable from the present case.  Here, the probation report listed multiple programs that would be available to M.C. at DJF to address M.C.'s particular needs.  The probation report described five of the programs more specifically.  Although none appeared to target gang activity in particular, three of the programs were intervention programs that focused on the development of pro-social skills and would "allow the minor to gain the tools needed to think ahead and make positive decisions, allowing him to be law abiding."  Similarly, the described "Re-Entry Program" would "partner the minor with community organizations, role models, and resources to increase protective factors and promote resiliency, and maximize his re-entry opportunities."  In addition, the educational opportunities and vocational training opportunities mentioned in the probation report and by the juvenile court also would provide M.C. a chance to complete high school and prepare for college or a career in his desired field of technology.  Thus, unlike the circumstances in *Carlos J.* and *Nicole H.*, the juvenile court here had before it specific information indicating how M.C. would benefit from a DJF commitment.

"A juvenile court must determine if the record supports a finding that it is *probable* the minor will benefit from being committed to [DJF]."  (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486 (*Jonathan T.*).)  "There is no requirement that the court find exactly how a minor will benefit from being committed to [DJF]."  (*Ibid*.)  Here, the juvenile court specifically noted M.C.'s success while living in a structured environment, his enmeshment in a local gang, and his interest in learning about technology.  In our view of the record, the DJF programs described in the probation report related directly to the issues identified by the court and demonstrated a probability that M.C. would benefit from the described programs.  The DJF programs provided an opportunity for M.C. to alter his trajectory toward more consistent pro-social behavior, particularly given the

19

challenges that presently confronted him in his home environment. In addition, the programs promoted M.C.'s proclaimed desire to pursue education and distance himself from his gang associates. Accordingly, we are satisfied there is substantial evidence supporting the court's finding of a probable benefit for M.C. from a commitment to DJF. (See *In re A.R.* (2018) 24 Cal.App.5th 1076, 1081.)

We likewise are not persuaded by M.C.'s argument that the record lacks sufficient support for the juvenile court's determination that less restrictive alternatives would be ineffective and inappropriate. As mentioned above, M.C. relies principally on *Calvin S.* when asserting that the juvenile court improperly based its finding on "personal belief." In *Calvin S.*, the Court of Appeal concluded there was not substantial evidence to support a finding that keeping the minor confined in juvenile hall would be ineffective or inappropriate. (*Calvin S.*, *supra*, 5 Cal.App.5th at p. 528.) The only information in the record in *Calvin S.* that ostensibly supported the juvenile court's rejection of a juvenile hall placement for the minor was "the court's statement that juvenile hall is 'not a treatment center,' but 'a detention center.' " (*Id.* at pp. 528–529.) Further, the juvenile court's statement was seemingly contrary to the evidence before the court that demonstrated the minor had been receiving and could continue to receive necessary educational, counseling, and rehabilitative services at juvenile hall. (*Id.* at p. 529.)

The circumstances here are not like those in *Calvin S.* Although the juvenile court in the present case mentioned its familiarity with the programs available at the Youth Center and the DJF and stated its favorable view of DJF staff based on personal interaction, the record included descriptions of DJF programs that would be available to M.C. and did not contradict the court's statement that DJF provided "the most comprehensive services." Moreover, the juvenile court thoroughly explained the evidence that demonstrated M.C.'s deep gang involvement and his quick relapse to very serious criminal activity with his local gang associates, despite being under probation supervision and attendant prohibitory conditions. In addition, the Monterey County

20

Youth Center's staff had reviewed M.C.'s case and opined that M.C. "was not a suitable candidate for the Youth Center." In sum, the record here provides substantial evidence to support the juvenile court's determination that placement of M.C. at the less restrictive Youth Center would be ineffective or inappropriate. (See *Jonathan T.*, *supra*, 166 Cal.App.4th at p. 486.) Accordingly, we conclude that the juvenile court did not abuse its discretion by committing M.C. to DJF.

## III. DISPOSITION

The juvenile court's dispositional order, dated April 16, 2020, is affirmed.

_____

Danner, J.

WE CONCUR:


_____

Elia, Acting P.J.


_____

Bamattre-Manoukian, J.


**H048184**
*People v. M.C.*